DECISION AND JOURNAL ENTRY
{¶ 1} Plaintiff-Appellant, Janice L. Kelly, appeals from the judgment of the Summit County Court of Common Pleas, Probate Division, which determined that Barbara A. Kelly's non-IRA accounts were properly distributed upon her death to Richard Wachter. This Court affirms.
 I {¶ 2} This matter is on appeal before this Court for a second time. Accordingly, we first recount its procedural and factual history. Barbara A. Kelly, now deceased, was a member of The Equitable Federal Credit Union, f/d/b/a May Associates Federal Credit Union, ("the Credit Union"). Barbara held five non-IRA accounts at the time of her death, all captioned with her member number, 5003. These accounts served as the basis of the underlying action between her daughter, Janice L. Kelly, and her nephew, Richard Wachter. *Page 2 
 {¶ 3} The documents that Barbara executed relative to her 5003 account are briefly recapped here. The Credit Union requires its members execute a "Share Account Card and Agreement" ("SACA") to identify the account holder and the nature of the account. In the instant matter, the front side of the SACA was entirely blank except for the member number 5003. The SACA is perforated in the middle, and below the perforation on the front is a subtitle "Share Account Agreement" which contains the default provisions if certain items on the SACA form are not completed.
 {¶ 4} On the reverse side of the SACA form are more default provisions, as well as boxes for determining whether the account is an individual account, a joint account with survivorship, or a joint account without survivorship. Again, these boxes were not marked and the only information on that side of the SACA was Wachter's address, phone number, social security number, and date of birth. The SACA form was signed by Richard L. Wachter on July 5, 2003 and by Barbara A. Kelly on July 23, 2003. Barbara passed away on August 17, 2003. Wachter later withdrew the funds from the five non-IRA accounts because he considered himself having a survivorship interest in them. This prompted Janice to file a concealment action against Wachter as executor of Barbara's estate. Janice later modified her complaint, and the matter proceeded as a declaratory action. Both parties moved for summary judgment in the probate court where it was determined that Janice was entitled to the entire amount contained in Barbara's Credit Union accounts. Wachter timely appealed to this Court, where we determined that the Credit Union's documentation provided sufficient evidence to conclude that Barbara had created a multiple party account with Wachter that contained survivorship provisions. See Kelly v. Wachter, 9th Dist. No. 23516,2007-Ohio-3061. We further concluded, however, that there was insufficient evidence to determine which of the five non-IRA survivorship accounts were *Page 3 
covered under the SACA, thus we remanded the case to the trial court to determine to which accounts the survivorship language applied.
 II First Assignment of Error "THE TRIAL COURT ERRED BY FINDING THE SHARE ACCOUNT CARD AND AGREEMENT APPLIES TO ALL FIVE NON-IRA ACCOUNTS."
 Second Assignment of Error "THE TRIAL COURT ERRED BY ORDERING THAT THE FUNDS IN ALL FIVE NON-IRA ACCOUNTS ARE NOT PART OF THE ESTATE OF BARBARA KELLY AND PROPERLY PASSED TO RICHARD WACHTER OUTSIDE OF PROBATE AT THE TIME OF DEATH OF BARBARA KELLY."
 {¶ 5} Though not providing any standard of review nor separately discussing each assignment of error in her brief pursuant to App. R. 16(A)(7) and Loc. R. 7(B)(7), Janice effectively argues that the trial court's determination was against the weight of the evidence when it found that the SACA applied to all five of Barbara's non-IRA accounts. We disagree.
 {¶ 6} This Court applies the standard of review set forth in C.E.Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus, when analyzing a manifest weight argument in the context of a civil trial. Huntington Natl. Bank v. Chappell, 9th Dist. No. 06CA008979, 2007-Ohio-4344, at ¶ 4, citing State v. Wilson, 113 Ohio St.3d 382,2007-Ohio-2202, at ¶ 24. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." Wilson at ¶ 24, quoting C.E. Morris at syllabus. When applying the aforementioned standard, a reviewing court "has an obligation to presume that the findings of the trier of fact are correct." Wilson at ¶ 24, quoting Seasons Coal Co., Inc. v.Cleveland (1984), 10 Ohio St.3d 77, 80-81. This is because the trier of fact is in the best position "to view the witnesses and observe *Page 4 
their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."Seasons Coal, 10 Ohio St.3d at 80. While "[a] finding of an error in law is a legitimate ground for reversal, a difference of opinion on credibility of witnesses and evidence is not." Id. at 81. Thus, in a civil manifest weight of the evidence analysis a reviewing court may not simply "reweigh the evidence and substitute its judgment for that of the [trier of fact]." Wilson at ¶ 40. Compare State v. Thompkins (1997),78 Ohio St.3d 380, 387 (describing the reviewing court's role in analyzing a criminal manifest weight of the evidence argument as that of the "thirteenth juror").
 {¶ 7} On remand, the bench trial of this matter consisted almost entirely of the testimony of Madeline Smith, assistant manager at the Credit Union. Specific to determining which accounts were covered under the SACA executed in July 2003, Smith testified that only one form, a SACA, was used to open an account, determine account ownership, and provide the ownership designation on an account. Smith further testified that it was possible for a member to have different types of account ownership designations with the Credit Union (i.e., an individual account, a joint survivorship account, and a payable on death account), but in order to accomplish that goal, the member would have to complete a separate SACA for each account that had a different ownership designation. Smith stated that each of those separately executed SACAs would result in the assignment of different member account numbers. Smith clarified, however, that if a member had multiple accounts which were opened at different times, all of which had the same ownership designation, they would all be captioned under one member account number, with subaccount designations.
 {¶ 8} Specific to determining the relationship of Barbara's accounts, Smith testified that "[t]he member number, the 5003, is the heading account. All subaccounts belong to that *Page 5 
membership, to whoever owns 5003[.]" Smith stated that the dates can differ as to when each subaccount was opened and depending on the nature of the subaccount, could have a different maturity date (as in the case of a certificate of deposit), but if they all had the same ownership type, they would be captioned under only one member number or "heading account." Smith explained that the Credit Union used "dash numbers" or a "trailer number" to identify and code the type of subaccount that fell within a member's account. According to Smith, trailer number "08" following Barbara's member account number meant that "5003-08" was a money market account; similarly, "5003-09" indicated that it was a regular checking account under Barbara's 5003 member account.
 {¶ 9} Smith also confirmed that transaction statements from the Credit Union prior to 1992 showed only Barbara's name as the account holder. In February 1992, however, Barbara completed a SACA which, similar to the one in this case, was blank with exception of Barbara and Wachter's signatures and social security numbers at the bottom and the member number "5003" at the top. Smith testified that the 1992 SACA changed the 5003 account to one that was joint with Wachter. Accordingly, the Credit Union statements from March and May 1993 for subaccounts 5003-25 and 5003-27 respectively were introduced, which showed both Barbara and Wachter's name as account holders, consistent with the SACA then on file. Similarly, in August 1995, Barbara executed another SACA which was also blank, except for her signature and an "X" next to "Individual." Smith testified that the 1995 SACA returned Barbara's 5003 account to an individual account status and correspondingly, Credit Union statements issued after that date no longer had Wachter's name listed as an account holder. The record likewise contains evidence that after the 2003 SACA at issue in this case was executed, a September 2003 Credit Union statement listed both Barbara and Wachter as account holders. *Page 6 
 {¶ 10} It is clear to this Court that the trial court's decision was not against the weight of the evidence, as Smith provided unequivocal testimony that one SACA governs the member's "heading account" and that any subaccounts created thereunder are subject to the same ownership provisions that govern the heading account. Moreover, the account holder names listed on the Credit Union account statements align with the corresponding SACAs that were in effect at the time the statement was issued and are also consistent with Smith's testimony as to how the heading accounts and subaccounts are treated internally.
 {¶ 11} Janice also maintains that the "joint account with survivorship" ownership designation applies only to the heading account numbered 5003 because that is the only number written on the 2003 SACA. She further asserts that the Credit Union's employees could not agree amongst themselves as to which accounts were governed by the 2003 SACA and that they had no documented rules or regulations in place that would dictate that the subaccounts, too, were considered joint accounts with survivorship. To bolster her argument, Janice points to our first determination of this matter where we found her case analogous toWright v. Bloom (1994), 69 Ohio St.3d 596, in that there was an absence of "evidence in the record of the Credit Union's * * * rules and regulations * * * [to] determine to which accounts [the] survivorship language applies." Kelly at ¶ 19. Because Smith's testimony indicated that the Credit Union does not have written or printed rules defining how a multiple party account is created or describing how member account and subaccount numbers are assigned, Janice argues that there are, in effect, no rules or regulations governing these processes. We disagree.
 {¶ 12} In the first appeal of this matter, the record reflected that the Credit Union's president, Mark Brunty, equivocated as to the rules and regulations governing the ownership of multiple accounts under the same member number. He stated that he was "not sure" whether *Page 7 
each of the five accounts at issue would require a separate SACA to determine ownership, but indicated that "[w]e would need to check with Madeline [Smith]." Id. at ¶ 20. Furthermore, Brunty did not refer to any documented rules or regulations, as was specifically the case inWright. Wright, 69 Ohio St.3d at 597 (noting that the contested bank account was governed by "Account Rules and Regulations" which were not included in the record of that case). Instead, Brunty explicitly stated that Smith would be able to inform the court on whether or not separate SACAs were required for each sub account.
 {¶ 13} On remand, Smith's uncontroverted testimony confirmed that it was the Credit Union's policy that only one form of account designation could apply to one member account number, thus Janice's contention that the five subaccounts held under Barbara's 5003 account could somehow have different designations per account is in error. Additionally, Smith testified that the Credit Union had policies and practices in place which were consistently applied to all accounts. While Smith admitted that the specifics relative to what accounts are governed by the SACA are not retained in any written or printed regulation at the Credit Union, it is clear from her testimony that the Credit Union's unwritten practices were consistently followed. Likewise, the trial evidence supports a finding that these unwritten practices were uniformly applied in Janice's case as well. We consider Smith's testimony and corresponding evidence about the changes Barbara made to the account ownership status between 1992 and 1995 to be equally as adequate as if the Credit Union was able to produce a written manual documenting such information. Based on a clearer understanding of how the Credit Union routinely treats a SACA and how one SACA governs both the heading account and its subaccounts, we are convinced that the trial court's decision was based on competent and credible evidence. *Page 8 
 {¶ 14} Upon reviewing the record, we consider there to be ample evidence that ownership of the 5003 member account and its subaccounts were governed by the names and ownership designations made on the July 2003 SACA. Having previously concluded that the July 2003 SACA reflected that Barbara and Wachter had joint ownership with survivorship in member account 5003, we find that the trial court correctly determined that the funds in all five non-IRA accounts had properly passed to Wachter outside of probate at the time of Barbara's death. Janice's first and second assignments of error are overruled.
 Third Assignment of Error "THE TRIAL COURT ERRED BY NOT FINDING THE FIVE SEPARATE NON-IRA ACCOUNTS WERE NOT MULTIPLE PARTY ACCOUNTS."
 {¶ 15} Janice's third assignment of error, though not separately captioned or articulated in her brief, asserts that the trial court erred by finding the non-IRA accounts were multiple party accounts. Because this court previously determined that exact issue in the last appeal of this matter, the law of the case precludes us from addressing it again at this time. See Nolan v. Nolan (1984), 11 Ohio St.3d 1, 3
(explaining that "the [law of the case] doctrine provides that the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels"). Therefore, Janice's third assignment of error is not well taken.
 III {¶ 16} Janice's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Probate Court is affirmed.
 Judgment affirmed. *Page 9 
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
 CARR, P. J. DICKINSON, J. CONCUR *Page 1